UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. __18-80040-Cr-Middlebrooks/Brannon__

**18 U.S.C. § 1349**

UNITED STATES OF AMERICA

v.

**ANTHONY JACKSON,**

Defendant.

_____/

FILED BY ___SP___
Deputy Clerk
**Feb 26, 2018**
STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. West Palm Beach

## INFORMATION

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

At all times material to this Information:

1.  Reflections Treatment Center ("Reflections") was located at 5100 Coconut Creek Parkway, Margate, Florida in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it offered clinical treatment services for persons suffering from alcohol and drug addiction. Reflections was owned and operated by Kenneth Chatman, who served as its "Chief Operating Officer," and managed all aspects of the facility, including hiring and firing personnel, admitting and discharging patients, and making financial decisions. Laura Chatman was listed as the sole owner of Reflections on the corporate records filed with the State of Florida and the licensing documents filed with the Department of Children and Families.

2.  Beginning in February 2016, the defendant, ANTHONY JACKSON, served as the Program Director of Reflections. ANTHONY JACKSON was a Certified Addiction Counselor. As

Program Director, ANTHONY JACKSON oversaw employees tasked with leading group sessions. JACKSON also personally led group therapy sessions.

### The Sober Homes

3. The defendant, ANTHONY JACKSON, and others known and unknown to the United States Attorney owned and operated a series of "recovery residences," commonly referred to as "sober homes," in Palm Beach and Broward Counties.

4. Pantherview Sober House LLC ("Pantherview") was a multi-bed residence in Palm Beach County, Florida, located at 2000 N.W. 1st Street, Boynton Beach, Florida, purporting to operate as a sober home. According to the articles of organization filed with the State of Florida on June 26, 2015, the defendant, ANTHONY JACKSON, was an authorized member of the LLC. According to corporate records filed with the State of Florida, as of June 2016, ANTHONY JACKSON was the registered agent and sole officer of Pantherview. The defendant, ANTHONY JACKSON, referred approximately 43 patients to Reflections. In exchange for having referred patients and for his work as Program Director of Reflections, JACKSON directly or indirectly received more than $79,000 in payments from Reflections.

### The Laboratories

5. Lab #1 was a laboratory located in the Middle District of Florida that performed urine, saliva, and other testing for Reflections.

6. Lab #2 was a laboratory located in the Southern District of Florida that performed urine and other testing for Reflections.

7. Lab #3 was a laboratory located in the Western District of Texas that performed urine and other testing for Reflections.

8. Lab #4 was a laboratory located in the Eastern District of Pennsylvania that performed urine and other testing for Reflections.

9. Lab #5 was a laboratory located in the Northern District of Texas that performed urine and other testing for Reflections.

### Federal Guidelines for Substance Abuse Treatment

10. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who are substance abusers. 42 U.S.C. § 290aa.

11. "Substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C. § 290cc-34(4). "Treatment" meant "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

12. In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes. Sober homes generally did not provide medical care or clinical services to their residents. When properly managed, sober homes operated as alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs, including providing a peer support network of individuals in recovery.

### Substance Abuse Treatment in Florida

13. Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Amongst other things, the Marchman Act made it unlawful for any person or agency to act as a substance abuse

3

service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a). Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fl. Stat. § 397.431

14. The Florida Department of Children and Families was tasked with regulating and licensing substance abuse service providers. Fl. Stat. § 397.321.

15. To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). Persons with qualifying felony convictions, including Kenneth Chatman, were ineligible to own, operate, or serve as personnel at licensed substance abuse service providers, including Reflections.

16. The Marchman Act also provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment." Fl. Stat. § 397.311(36).

## Payment for Substance Abuse Treatment

17. Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP")), health plans sponsored by private employers (including the National Railroad Passenger Corporation ("Amtrak") employee health care benefit plans), and health plans offered directly by private insurance companies. Health plans sponsored by private

4

employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

18. Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield ("BCBS"), Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

19. Reflections, Lab #1, Lab #2, Lab #3, Lab #4, and Lab #5 submitted claims for reimbursement to more than forty health benefit plans, including the FEHBP plans, Amtrak's established plans, and private ERISA and non-ERISA health benefit plans (jointly referred to as "the Insurance Plans").

20. The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

21. Regardless of the type of Insurance Plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

22. The "Florida Patient Brokering Act," made it a felony offense for any person, health care provider, or health care facility, including any state licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral

5

of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

23. Florida law also provided that it was "a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

24. Under the terms of the insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were "medically necessary" and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

### Payment for Residing at Sober Homes

25. Unlike treatment facilities, sober homes generally did not provide medical care or clinical services that could be reimbursed by health insurance. While there were federal and state guidelines, sober homes were not licensed or funded by state or local governments. Since sober

6

homes were merely places to live, legitimate sober homes generated income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

### Bodily Fluid Testing

26. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

27. Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy. The Insurance Plans were only responsible for claims for testing that was "medically necessary," actually performed, properly prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

28. The Insurance Plans provided guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, for the types and frequency of testing that would be reimbursable. This guidance was based upon policy statements from the American Society of Addiction Medicine ("ASAM"), publications by expert researchers in the area of substance abuse treatment, and policies of federal and state governmental agencies.

### Count 1
### (Conspiracy to Commit Health Care Fraud - 18 U.S.C. § 1349)

29. Paragraphs 1-28 of the "General Allegations" section of this Information are re-alleged and incorporated herein.

30. From at least as early as July 2015, through on or about December 21, 2016, in Palm Beach and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ANTHONY JACKSON,**

did knowingly and willfully combine, conspire, confederate, and agree with Kenneth Chatman, Laura Chatman, and others known and unknown to the United States Attorney to violate Title 18, United States Code, Section 1347, that is, in connection with the delivery of and payment for health care benefits, items, and services, to execute and attempt to execute, a scheme and artifice to: (a) defraud health care benefit programs, as defined by Title 18, United States Code, Section 24(b); and (b) obtain, by means of materially false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, health care benefit programs, as defined by Title 18, United States Code, Section 24(b).

## OBJECT OF THE CONSPIRACY

31. It was the object of the conspiracy for the defendant to unlawfully enrich himself and others, by defrauding health care benefit programs and obtaining the money of health care benefit programs to which the defendant and his co-conspirators were not entitled.

## MANNER AND MEANS OF THE CONSPIRACY

32. The manner and means by which the defendant and his co-conspirators sought to accomplish the object of the conspiracy included, among other things, the following:

    a. Defendant ANTHONY JACKSON and co-conspirators established sober homes, which were purportedly in the business of providing safe and drug-free residences for individuals suffering from drug and alcohol addiction.

    b. Co-conspirators created and signed documents to conceal the fact that co-conspirator Kenneth Chatman had an ownership and managerial interest in the sober homes.

8

   c.  To obtain residents for the sober homes, defendant ANTHONY JACKSON and co-conspirators provided kickbacks and bribes, in the form of free or reduced rent and other benefits to individuals with insurance who agreed to reside at the sober homes, attend drug treatment, and submit to regular and random drug testing (typically three or more times per week), so that members of the conspiracy could bill the testing and treatment to the residents' Insurance Plans.

   d.  Although the sober homes were purportedly drug-free residences, ANTHONY JACKSON and co-conspirators permitted the residents to continue using drugs as long as they attended treatment and submitted to drug testing. In some instances, co-conspirators provided residents with drugs.

   e.  Co-conspirators established Reflections, which was purportedly in the business of providing effective clinical treatment services for persons suffering from alcohol and drug addiction.

   f.  Co-conspirators created and signed documents to conceal the fact that Kenneth Chatman had an ownership and managerial interest in Reflections because Kenneth Chatman could not lawfully own or operate a substance abuse treatment center licensed by the State of Florida.

   g.  Co-conspirator Laura Chatman signed documents submitted to DCF and appeared at Reflections for inspections by DCF and other accrediting agencies in order to conceal Kenneth Chatman's ownership and management of Reflections.

   h.  Defendant ANTHONY JACKSON and other co-conspirators who owned, operated, and managed sober homes referred the residents with insurance to become patients at Reflections, which was owned and operated by Kenneth Chatman, in return for kickbacks and bribes

from Kenneth Chatman, which kickbacks and bribes were often disguised as marketing fees, consulting fees, commissions, and case management fees.

   i. Defendant ANTHONY JACKSON and co-conspirators required the sober home residents to travel to Reflections approximately three times per week to attend purported substance abuse treatment sessions and to submit to drug testing, which co-conspirators could bill to the Insurance Plans. To this end, Kenneth Chatman sent vans to the sober homes to transport the residents to Reflections.

   j. In many instances, sober home residents were not present when the van arrived and therefore did not attend the purported treatment sessions at Reflections and did not provide bodily fluid samples for drug testing. On such occasions, co-conspirators caused employees of Reflections to forge patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluid samples.

   k. Co-conspirators would obtain urine and saliva samples from employees of Reflections and from other patients, and submit these samples for testing as if they had been obtained from the absent patients.

   l. Co-conspirators caused confirmatory testing to be performed and testing and substance abuse treatment to be billed for patients knowing that the patients had been discharged or had left the treatment centers and were no longer receiving treatment or submitting bodily fluid samples for testing at the treatment centers.

   m. ANTHONY JACKSON signed off on thousands of patient records and therapy notes at Reflections as a primary therapist. These notes were copied and pasted multiple times by ANTHONY JACKSON and co-conspirators to make it appear as though professionally directed therapy sessions had taken place, when in fact they had not. Defendant ANTHONY

JACKSON knew that these falsified treatment records would be used as the basis for fraudulent insurance claim forms, attesting that treatment had been medically necessary and actually rendered when, in truth and in fact, it had not been necessary or performed.

n.  Despite the responsibility to provide professionally directed services designed to reduce or eliminate the misuse of drugs and alcohol, defendant ANTHONY JACKSON and co-conspirators knew that members of the conspiracy allowed patients at Reflections to continue using drugs, and JACKSON knew that co-conspirators failed to modify treatment plans or refer relapsed patients to detox or other facilities that would truly assist the patients in achieving sobriety.

o.  Co-conspirator owners, employees, and agents of Reflections ordered and caused the ordering of expensive urine and saliva drug screens and allergy testing which were not medically necessary in that (i) the confirmatory tests were duplicative because patients' urine samples were split and sent to multiple laboratories for the same tests; (ii) the test results were not timely reviewed or used by a doctor or treatment professional in developing or modifying the patients' treatment plans; (iii) tests were not ordered until after the tests were performed; and (iv) the tests were not determined to be medically necessary on an individualized basis by a doctor prior to being performed.

p.  Defendant ANTHONY JACKSON and other members of the conspiracy directly and indirectly solicited and received kickbacks and bribes from co-conspirator clinical laboratory agents and employees for sending the lab tests related to patients of Reflections to the clinical laboratories that, in turn, would bill the patients' Insurance Plans. These kickbacks and bribes were sometimes disguised as gifts, investments, and dividends.

q.  Co-conspirators electronically signed hundreds of lab test results for Reflections' patients falsely certifying that they had reviewed the results and the statements of

11

medical necessity for the lab testing despite the fact that the results were weeks or months old and many of the patients had already left Reflections.

    r.    Members of the conspiracy elected not to collect mandatory co-pays, deductibles, and other co-insurance from patients that could cause patients to be unable or unwilling to submit to testing and treatment so that the members of the conspiracy could, instead, collect the much larger reimbursements from the Insurance Plans. The members of the conspiracy did not inform the Insurance Plans that they were not collecting the co-insurance payments as required by the terms of the Insurance Plans.

    s.    Co-conspirator owners, employees, and agents of Reflections prepared and caused the preparation and submission of fraudulent insurance claim forms attesting that the billed amounts qualified for reimbursement, that is, (i) the claims falsely stated that the testing and treatment had been medically necessary and actually rendered when, in truth and in fact, some of the claimed testing and treatment had not been necessary or performed; (ii) the claims failed to disclose that the patients had not been asked to pay their co-payments and deductibles; and (iii) the claims failed to disclose that Reflections had obtained its licenses through false statements and omissions.

All in violation of Title 18, United States Code, Section 1349.

_____
BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

_____
ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA     CASE NO. _____

v.

ANTHONY JACKSON,                     **CERTIFICATE OF TRIAL ATTORNEY***

        Defendant.
_____/    **Superseding Case Information:**

**Court Division**: (Select One)

| | | |
|---|---|---|
| ___ Miami | ___ Key West | New Defendant(s)   Yes ___ No ___ |
| ___ FTL | _X_ WPB ___ FTP | Number of New Defendants ___ ___ |
| | | Total number of counts ___ ___ |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) __No__

   List language and/or dialect _____

4. This case will take __10-15__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                          (Check only one)

   | I    | 0 to 5 days   | ___ | Petty  | ___ |
   |------|---------------|-----|--------|-----|
   | II   | 6 to 10 days  |     | Minor  |     |
   | III  | 11 to 20 days | _X_ | Misdem.|     |
   | IV   | 21 to 60 days | ___ | Felony | _X_ |
   | V    | 61 days and over | | | |

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes:
   Judge: _____  Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____
   Is this a potential death penalty case? (Yes or No) __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?  ___ Yes  _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?  ___ Yes  _X_ No

                                                            _____
                                                            ALEXANDRA CHASE
                                                            ASSISTANT UNITED STATES ATTORNEY
                                                            District Court No. A5501746

*Penalty Sheet(s) attached                                                                     REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** ANTHONY JACKSON

**Case No:**

Count #1:

Conspiracy to commit health care fraud

Title 18, United States Code, Section 1349

**Max. Penalty:** Ten years' imprisonment; $250,000 fine or twice the value of the gross gain or loss, whichever greater; three years' supervised release; restitution; $100 special assessment

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT: ANTHONY JACKSON

$50,000 personal surety bond and $10,000 10% bond
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Alexandra Chase

Last Known Address: Lantana, Florida

What Facility: _____

Agent(s): William Stewart, FBI
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| Anthony Jackson, ) | |
| ) | |
| *Defendant* ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

I. Scott Skier, Esq.
*Printed name of defendant's attorney*

JAMES M. HOPKINS
*Judge's signature*

UNITED STATES MAGISTRATE JUDGE
*Judge's printed name and title*