UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-80040-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA

v.

ANTHONY JACKSON,

   Defendant.
_____/

FACTUAL PROFFER

Defendant Anthony Jackson, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and the following facts are true and correct and are sufficient to support a plea of guilty:

1. At all times relevant to the Information, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

2. At all times relevant to the Information, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

3. To ensure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a service provider with personnel who did not pass the background test. Fl. Stat. § 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment center mentioned in the Information, Reflections Treatment Center ("Reflections"), applied for and received licenses and operated as a service provider by hiding the fact that co-conspirator Kenneth Chatman, who had a prior federal felony conviction, owned Reflections and was its Chief Operating Officer.

4. The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance

abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

5. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

6. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield ("BCBS") was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

7. The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for-profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

8. Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

9. All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

10. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance

documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

11. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

12. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

13. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually and lawfully rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

14. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

15. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, properly prescribed, and lawfully conducted by a properly licensed service provider, and conducted and billed in compliance with the law and the terms of the health care plan, including the obligation to pay co-insurance.

16. POC urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific

types of drugs, including the most common drugs of abuse like cocaine, opioids, and heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

17. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

18. Reflections was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-conspirator Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions.

19. Defendant Anthony Jackson was a Certified Addiction Counselor who also owned and operated his own sober home, Pantherview Sober House LLC "(Pantherview"). The defendant opened Pantherview in or around June 2015. The defendant received kickbacks and bribes from co-defendant Kenneth Chatman for referring Pantherview residents to Reflections for treatment. These kickbacks and bribes were disguised as "case management fees," "consulting fees," "marketing fees," and "commissions." The defendant received cash and checks for referring patients to Reflections. The defendant was responsible for referring at least 43 patients to Reflections.

20. The defendant and co-defendant Kenneth Chatman and others further paid bribes and kickbacks to insured patients who attended treatment, in the form of free or reduced rent, cigarettes, and other items. Insured patients were also allowed to continue using drugs, so that they could appear as though they had "relapsed," which would allow Chatman to continue billing their insurance for their purported treatment.

21. In February 2016, the defendant was hired by Kenneth Chatman to serve as the Program Director for Reflections. As Program Director, the defendant oversaw employees tasked with leading group sessions. The defendant also personally led group therapy sessions. But in many instances these therapy sessions were simply a cover to bill insurance for the session. Notes from various therapy sessions were simply copied and pasted into the notes for another patient. These contained errors relating to the sex of the patient (e.g., many female patient notes use male pronouns). The notes would also contain repetitions of unique events, such as references to the death of the patient's grandmother. A review of the electronic medical records from Reflections shows that the defendant signed off on thousands of patient records and therapy notes as the

primary therapist. An analysis of those records shows that as discussed above, notes were copied and pasted multiple times by the defendant and other therapists under his supervision.

22. Instead of the various medical directors of Reflections using their clinical expertise and his individual assessments of patients to decide what type of treatment and laboratory testing was needed by each patient, co-conspirator Kenneth Chatman dictated which patients were admitted and discharged and the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories. Chatman dictated that confirmatory urine drug testing on dozens of panels for street and prescription drugs would be performed three days per week, duplicative saliva drug testing would occur, and every patient would receive DNA and allergy testing regardless of whether patients complained of allergies.

23. The defendant knew, based upon drug test results, patient statements, and observation, both through his role as Program Director at Reflections and through his role as owner/operator of Pantherview, that Reflections patients were continuing to use controlled substances and that Kenneth Chatman was advising patients that they were allowed to continue using controlled substances. On most occasions, the defendant and clinical staff simply allowed the behavior to continue. On other occasions, co-conspirators would recommend referring relapsed patients to detox or other facilities that would truly assist the patients in achieving sobriety. Co-conspirator Chatman, who had no medical or clinical training, would overrule these recommendations because discharging the patients would end Chatman's ability to bill the patients' insurance plans.

24. With regard to bodily fluid testing, based upon Chatman's instructions, "standing orders" were prepared and provided by clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, Reflections' medical directors signed these "standing orders" that authorized testing patients before the patients had even seen the doctor, including conducting duplicate tests of patients' urine and saliva. To conceal the fact that these tests were not medically necessary, co-conspirators signed "medical necessity statements" after the fact that falsely stated that the testing was needed, that the test results had been reviewed, and that the tests were used to direct the course of the patients' treatment. In truth, the medical directors did not timely monitor the drug test results and knew that they were not used to direct the patients' treatment.

25. In many instances, the sober home residents did not attend the purported treatment sessions at Reflections and did not provide bodily fluid samples for drug testing. On some of these occasions, co-conspirators would forge patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluids samples. As discussed above, members of the clinical staff would "cut and paste" to create treatment notes that made it appear as though the absent patients were present. As Program Director, the defendant was aware that duplicative notes were included in multiple patient files, and indeed created duplicative notes himself.

26. Had this case gone to trial, the United States would have shown that the defendant knew that insurance claims based upon the medically unnecessary drug testing and treatment were

submitted to patients' health insurance plans, both through his direct submission of UAs from Pantherview to various labs listed in the information, in return for kickbacks; as well as through his recruitment of patients for Reflections in exchange for their insurance billing. From July 2015, when the defendant first received payment from Reflections for the above scheme, through the end of the company, Reflections received over $5 million in reimbursements from insurance companies.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 4/12/18    By: _____
ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY

Date: 4/12/18    By: _____
I. SCOTT SKIER, ESQ.
ATTORNEY FOR DEFENDANT

Date: 4/12/18    By: _____
ANTHONY JACKSON, DEFENDANT